UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>    v.<br><br>ANOUSONE SAVANH,<br><br>                          Defendant. | Case No. 2:14-cr-00290-KJD-PAL<br><br>**AMENDED<br>REPORT OF FINDINGS AND<br>RECOMMENDATION**<br><br>(Mot Suppress - Dkt. #84) |

This amended report of findings and recommendation is being submitted to correct a typographical error on page 9, line 3. No other changes have been made this document.

Before the court is Defendant's Anousone Savanh's ("Savanh") untimely filed Motion to Suppress Statements (Dkt. #84) which was referred to me for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the Motion (Dkt. #84), the government's Response (Dkt. #89), and Savanh's Reply (Dkt. #90)

## **BACKGROUND**

Defendant Anousone Savanh ("Savanh") is charged in an Indictment (Dkt. #17) returned August 27, 2014, with receipt or distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2)(B) and possession of child pornography in violation of 18 U.S.C. § 2252(A)(a)(5)(B). He was initially charge in a criminal Complaint (Dkt. #1) filed March 21, 2014. He appeared for his arraignment and plea on September 3, 2014, pled not guilty, and a trial date was set for November 3, 2014, at 9:00 a.m. *See* Minutes of Proceedings (Dkt. #24).

Pursuant to the court's standard order regarding pretrial procedure, motions were due October 3, 2014. *See* Order (Dkt. #21). Thereafter, the parties stipulated (Dkt. #26) to continue the motion deadlines and trial date. The district judge approved the stipulation and continued the trial date and extended the deadline for filing motions until December 2, 2014. *See* Stipulation

and Order (Dkt. ##26, 27).  The parties stipulated to continue the deadlines several times more.  The deadline for filing pretrial motions set by the parties' last stipulation and the court's order expired May 5, 2015.  This case is currently set for trial April 18, 2016.

The motion to suppress acknowledges that the motion was not timely filed.  It argues that statements Mr. Savanh made to Detective Nichols on March 19, 2014, were not voluntary and were obtained in violation of *Miranda*.  The motion requests an evidentiary hearing.  It is supported by manually filing audio recordings of the interrogations at issue as Exhibits A and B, and a transcript of the interrogations submitted as Exhibit C.

Savanh argues that under the totality of the circumstances, he was subjected to coercive police activity and psychological pressure which rendered his statements involuntary.  Specifically, he argues that numerous state and federal police officers were present at his house to execute a search warrant in the early afternoon hours of March 19, 2014.  Six officers rushed into his home with their guns aimed at him and told him to come out with his hands up.  Savanh was moved outside in his underwear to a police car down the street.  Eventually, he was moved into the living room of his home, handcuffs were removed, and he was allowed to dress.  However, he was not permitted to leave the living room or call his wife.  He was subsequently ordered back out to the police car by Detective Wayne Nichols where he was questioned a second time.

In the first interrogation, Detective Nichols read Savanh his *Miranda* rights and advised Savanh he was investigating illegal downloads over the internet.  Savanh was asked a number of questions and initially told Detective Nichols was investigating child pornography.  Detective Nichols asked Savanh to rule himself out as the person downloading pornography, or tell Detective Nichols who was responsible, and that his adult son and wife would be questioned about the child pornography on the computer.  Savanh initially denied that he had downloaded any child pornography, but after confronted with evidence that child pornography had been found on his computer, he made incriminating admissions.

Under the totality of the circumstances, Savanh alleges his will was overborne because a number of armed police officers and federal agents controlled his every move while he remained

in custody for several hours, he was isolated from his family members, and he was prevented from speaking with his wife. Additionally, Detective Nichols' statements to him caused him to fear his adult son would go to jail if he refused to cooperate.

Savanh also argues that his personal characteristics made him more susceptible to the coercive tactics that were employed by Detective Nichols. Specifically, Mr. Savanh escaped violence in Laos and lost his father at a young age. He and his mother escaped to seek refuge in the United States, but his father was killed by military forces during the Laotian civil war. Mr. Savanh is deferential to authority. Detective Nichols told Savanh he was not being honest and that his answers did not make sense, and Savanh was pushed until Detective Nichols got the answers he wanted. Detective Nichols repeatedly asked Savanh the age group of children he was interested in. Savanh initially denied that he had an age preference, but finally gave an answer. Savanh told Detective Nichols that his "brain has been troubled" and that he had been sexually abused as a child. Under all of these circumstances, Savanh claims his will was overborne by the police, and his confession was therefore not voluntary.

Savanh also argues that although he received and waived *Miranda* warnings during the first interrogation, he should have been re-*Mirandized* because his circumstances had changed between the two interrogations requiring re-advisement of rights. Detective Nichols advised Savanh that in excess of a thousand images of child pornography had been found on his computer which indicated to Savanh that someone was now going to jail. Savanh told Detective Nichols that he had been vague about his son earlier because he did not want both of them to go to jail. During the second interrogation, Savanh saw his wife through the window of Detective Nichols' car and pointed her out. Savanh's wife was not permitted to enter the home or approach the car where Mr. Savanh was being interrogated which sent a clear signal to Savanh that his rights had changed and he was now going to jail no matter what he said. The court must decide whether a reasonable person in Mr. Savanh's position would have felt deprived of his freedom of action in any significant way, such that he would not have felt free to terminate the interrogation.

Savanh also argues that in the context of interrogations outside of the police station, the Ninth Circuit identifies the factors articulated in *United States v. Craighead*, 539 F.3d 1073,

1084 (9th Cir. 2008) in evaluating whether the circumstances of an interrogation constituted a police dominated atmosphere such that a person is in custody for purposes of *Miranda*. Here at least thirteen armed police officers and federal agents were present at his home on the date the search warrant was executed. Second, the officers immediately cuffed him while he was in his underwear and controlled his physical movements for hours. Third, Savanh was isolated from his family members as they tried to approach the home and police car. Fourth, Savanh was not informed he was free to leave or terminate the interrogation. Rather, at the start of the second interrogation, Detective Nichols made a perfunctory statement to the effect that "You still understand your *Miranda* rights. You understand you don't have to speak to me, correct, sir?" This was insufficient. Savanh was never told he was free to leave the interrogation and could not have reasonably believed he was free to leave. Therefore, statements made during the second interrogation should be suppressed under *Miranda* because the interrogation violated his Fifth Amendment protections.

The government opposes the motion arguing the court should deny it as untimely. However, on the merits, the government argues that the audio recordings of Detective Nichols' interview with Savanh are the best evidence of the conversation that transpired between the two men. Savanh received and waived *Miranda* warnings signing a written waiver. The government also disputes that Savanh was under arrest, that his movements were controlled at all times, and that he was isolated from family members. The tape-recorded interviews with Detective Nichols indicate that Savanh kept his phone and answered cell phone calls with family members. Both interviews lasted less than one hour.

The government's motion is supported by an attached incident report prepared by Detective Nichols, the written waiver of *Miranda* rights Savanh signed, and photographs showing the condition of the interior of Savanh's residence before it was searched, as well as photographs of Detective Nichols' unmarked minivan where the questioning occurred.

Savanh's reply argues that the government's opposition establishes factual disputes which should be addressed at an evidentiary hearing.

/ / /

4

**DISCUSSION**

The government has the burden of proving, by a preponderance of the evidence, whether a confession is voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972). The government must also establish, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

**I.      The Requirement for *Miranda* Warnings.**

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *See Thompson v. Keohane*, 516 U.S. 99, 102 (1995). In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. at 300-01. The Supreme Court and courts of appeal have repeatedly emphasized that many types of questions are not considered interrogation and do not require *Miranda* warnings. For example, questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Asking a suspect questions regarding general biographical information is not interrogation. *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

A valid waiver of *Miranda* rights depends upon the "totality of the circumstances including the background, experience, and conduct of defendant." *United States v. Garibay,* 143 F.3d 534, 536 (9th Cir. Cal. 1009) (citing *United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir. 1986)).

There is a distinction between a claim that a *Miranda* waiver is not voluntary and a claim that a *Miranda* waiver was not knowing and intelligent. The voluntariness of a waiver has always depended on the absence of police overreaching. *See Connelly,* 479 U.S. at 170. Although courts often merge the two-pronged analysis, the components should not be conflated. *See Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). First, a valid *Miranda* waiver requires a showing that it was voluntary and the product of a free and deliberate choice rather than the product of intimidation, coercion, or deception. Second, a valid *Miranda* waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See United States v. Frank*, 956 F.2d 872, 877 (9th Cir.1992).

Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court conclude that *Miranda* rights have been waived. *Id.* at 877.

## II. Voluntariness.

A statement is voluntary where it is "the product of a rational intellect and free will." *See United States v. Kelley*, 953 F.2d 562, 564 (9th Cir. 1992) (*citing Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)). In examining the voluntariness of a confession, the court must consider "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *See Derrick*, 924 F.2d at 817. In addition, the Supreme Court has determined that coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *See Connelly*, 479 U.S. at 167. It is the government's burden to prove that a confession was voluntary by a preponderance of the evidence. *See United States v. Jenkins*, 958 F.2d 934, 937 (9th Cir. 1991) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)); *Connelly*, 479 U.S. at 168.

To determine whether a confession is voluntary, the court applies a totality of the circumstances test. *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion, or by improper inducement so that the suspect's will was overborne." *Id.* In assessing the voluntariness of a confession, the court considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Gifferson v. United States*, 530 U.S. 428, 434 (2000).

District courts are required make a pretrial determination of the voluntariness of confessions. *See* 18 U.S.C. § 3501. However, a defendant must file a motion to suppress an involuntary confession before the pretrial motion deadline. Fed. R. Crim. P. 12(b)(3)(C), (c)(1). If a defendant does not file his suppression motion before this deadline, "the motion is untimely" and the defendant waives his objection to admission. Fed. R. Crim. P. 12(c)(3). *See also United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984) (citing *United States v. Maher*, 645 F.2d

6

1    780, 783 & n.1 (9th Cir. 1981) (applying Rule 12 to an untimely motion under 18 U.S.C.

2    § 3501).  A court may consider the request "if the party shows good cause."  Fed. R. Crim. P.

3    12(c)(3).  "The decision whether to grant an exception to a Rule 12 waiver lies in the discretion

4    of the district court."  *United States v. Tekle*, 329 F.3d 1108, 1113 (9th Cir. 2003) (citing

5    *Gonzales*, 749 F.2d at 1336).  *See also United States v. Kessee*, 992 F.2d 1001, 1002 (9th Cir.

6    1993).  A belated decision to change trial tactics does not constitute good cause to excuse the

7    waiver.  *Gonzales*, 749 F.2d at 1336.

8    **III.    Analysis and Decision.**

9        This motion was not timely filed.  It was filed more than nine months after the last

10   extension granted for filing pretrial motions.  There was no request to extend the deadline to file

11   this motion.  There is no explanation for why the motion was not timely filed let alone a showing

12   of good cause.

13       It is undisputed that Savanh received and waived *Miranda* warnings.  An audio recording

14   of the interrogation reflects the exact rights that were read to Savanh from a standard admonition

15   of rights card.  Savanh signed a written acknowledgement and waiver of his *Miranda* rights.

16   Savanh's motion to suppress and reply make bald, unsupported assertions that he was subjected

17   to coercive police activity.  The motion is not supported by an affidavit or offer of proof.  The

18   government concedes that the officers breached the door and entered the residence with guns

19   drawn pursuant to standard police policy in executing a search warrant.  The transcript and tape

20   recording of Savanh's interviews with Detective Nichols confirm that the officers knocked on

21   the door and rang the doorbell.  No one answered and the officers therefore forcibly entered the

22   premises.  The government concedes that Savanh was initially handcuffed until the premises was

23   cleared and officers determined that no one else was present.  Savanh does not claim that he was

24   handcuffed while being interviewed by Detective Nichols in the minivan parked outside.

25       The first tape recorded interview lasted approximately twenty-eight minutes between

26   2:00 p.m. and 2:28 p.m.  Detective Nichols advised Savanh that he was there to investigate

27   illegal downloads.  He did not initially tell Savanh that the initial downloads involved child

28   pornography.  Savanh answered preliminary background questions about who lived in the

residence, how many computers the residence had, and where they were located.  Detective Nichols eventually indicated that he was not investigating downloading movies or songs, but child pornography.  He told Savanh that he was there to investigate whether Savanh was involved in the investigation so that he could eliminate one person at a time.  At no point during the initial interview did Nichols tell Savanh that he, his wife, or adult son would go to jail.  Rather, Detective Nichols told Savanh that he would talk with his wife and adult son about the investigation when they got home.

Savanh's motion to suppress claims that Detective Nichols was somehow exploiting the parent/child relationship.  The audio and transcribed interviews belie this suggestion.  To the contrary, Detective Nichols repeatedly told Savanh that he was investigating who was responsible for the child pornography the police believed was on a computer in the residence.  It was Savanh who evaded direct questions during the first interview about whether Savanh himself was the one downloading child pornography.  Savanh was asked about others, including his adult son, who might have access to computers inside the residence.  Savanh stated that he did not know what might be on the computer of his adult son.

Additionally, Savanh's motion suggests that Savanh was somehow isolated from his family.  The tape recorded interviews, however, do not support this claim.  The motion is not supported by an affidavit or offer of proof to the contrary.  It is undisputed that Savanh was the only one home at the time officers initially executed the search warrant.  During the first interview, Savanh had a cell phone and answered the phone twice.  While he was in Detective Nichols' vehicle, he pointed out that his wife had arrived.  He did not ask to speak with his wife and nothing in the record suggests that Savanh's wife attempted to speak with him.  Rather, the transcript of the interview clearly indicates that Detective Nichols told Savanh that his wife would be allowed to enter the residence.  The adult son was picking up Savanh's two younger children from school.  Detective Nichols told Savanh that when his adult son arrived with his two other sons Savanh would be allowed to speak with them and could tell them what he wanted to about the officers' presence.

/ / /

During the first interview Savanh was told that the police were looking for evidence authorized by the search warrant and that he would be returned to the house and allowed access to his own home, although he would not be allowed to interfere with the search. Savanh acknowledges that he re-entered the house.

The first tape recorded interview with Detective Nichols lasted approximately twenty-eight minutes.  The second interview began at 2:50 p.m. and ended at 3:25 p.m.  At the beginning of the second interview, Detective Nichols stated that both had consensually ended the first interview to go into the house and were now back on the record.  Nichols related that while back in the house, Nichols pulled Savanh into the bedroom where a computer was being examined and that Nichols asked if the computer was his or in his bedroom, and that Savanh said yes.  Nichols then stated, "I want to make sure that you know that we're going back on the record.  You still understand your *Miranda* rights.  You understand you don't have to speak with me, correct sir?"  Savanh responded, "Yes sir.  I understand."  Detective Nichols followed up with "and am I good to kind of get some follow up questions?"  Savanh responded, "Yes."

It was during the second interview that Savanh eventually made incriminating statements that he had downloaded pornography, including child pornography, and that he had been doing so for more than five years.  He was asked questions about how he accessed the child pornography, and explained that he used Google, Yahoo! and AOL and typed in words to initiate the search like "teen pics" and "pre-teen pics".  He initially told Detective Nichols he accidentally downloaded child pornography.  However, after further questioning, he admitted that he downloaded a large amount of pornography and described how he typed in the terms "teen pics" or "teen gallery" which brought up the search which brought him to a website that had subcategories.  He repeatedly indicated that he looked at the pornography, but then deleted it because he did not want his wife or children seeing the material.

At one point during the second interview, Detective Nichols suggested that they take a break because it appeared Savanh was becoming worked up, and becoming very agitated.  This was after Detective Nichols asked whether Savanh had a sexual attraction that he was struggling

with.  Savanh responded that he had never ever touched anyone's kids.  Detective Nichols responded "I didn't say you did."  The following exchange occurred:

| | | |
|---|---|---|
| Question: | I didn't say you did, Mike.  You need—you need to—let's go ahead and take a break, here— |
| Answer: | Sorry. |
| Question: | --because you're getting way worked up, here— |
| Answer: | Sorry. |
| Question: | --and you're coming off as very agitated. |
| Answer: | Well, no, I'm agitated at myself.  I'm not agitated at you.  I'm—I'm mad at myself for, you know, even doing it in the first place. |

Transcript.  Exhibit C. p. 39.

Savanh went on to tell Nichols that he was not upset with Nichols.  It was shortly after this that Savanh pointed out that his wife had arrived and stated "I don't know if she knows." Nichols told Savanh that his wife could go into the house.

At one point, after Savanh admitted to Detective Nichols that he had been downloading child pornography for over five years, Nichols asked whether he had been accidentally doing this for five years.  Savanh responded, "No, no, no."  *Id.* at p. 41.  Nichols asked whether viewing the material gave him some type of gratification and Savanh denied it.  *Id.* at 42.  Detective Nichols began to ask whether Savanh had some type of history and noted that "—you're laughing Mike. I don't understand."  Savanh responded, "'Cause I don't understand neither.  That's why I'm laughing."  *Id.* at 42.  Nichols told Savanh he was not judging him and Savanh responded, "I appreciate that and—and even if you were I—I'm guilty of it.  There's not much I can do about it."  *Id.* at 43.  He went on to explain that it was a struggle "because I was sexually assaulted as a kid."  *Id.*

A few minutes later, Savanh told Nichols that he did not want to lie to Nichols about whether there was anything on his son's computer, because "I don't know what he does.  If he's downloading stuff, too, I don't—I didn't want to say I'm the only one."  *Id.* at 44.  Nichols then

told Savanh that officers did not locate any content on his son's computer and Savanh thanked him. *Id.*

Savanh went on to explain that he deleted everything after he reviewed it and claimed that he did not realize that the images were kept in his recycle bin. He reiterated that he did not want his wife and kids to see that he was downloading it. After a number of additional questions, Nichols told Savanh he appreciated Savanh being honest. Savanh responded, "No problem." *Id.* at 57. A few questions later, after asking about child pornography involving babies, Detective Nichols apologized to Savanh if he had been offended. Savanh responded, "No, I apologize. Ok?" *Id.* at 58. It was at this point that Nichols asked Savanh whether he had a preference for an age group. Savanh denied he had a preference, but ultimately said, "12-year-olds and up." *Id.* at 60. Savanh expressed that he felt guilty about downloading child pornography:

> Yeah. I don't like—I don't like it. It's a—it's a guilt thing, you know? And you basically know it's wrong and you wish you don't have to do it. You wish you didn't have to do it but, you know, that's the way it goes. And you know what? And—and to tell you the truth, Wayne, I—I, you know, I already—I already knew, you know, that you guys were on to me. I already knew you guys were going to come. It's just a matter of time. And like I said, I—I…

*Id.*. at 62.

Detective Nichols promised Savanh that he would be treated professionally and Savanh responded, "You are." *Id.* at 64. Detective Nichols then told Savanh what to expect, that the police would take the evidence and analyze it and make a decision about prosecution. Nichols expressly told Savanh that the case would be prosecuted. Savanh responded, "I understand." *Id.* at 67. Detective Nichols then told Savanh that if Savanh would guarantee that he would remain in contact, Nichols would call Savanh on the phone to make arrangements for him to surrender himself instead of arresting him at work or in front of his family. *Id.* at 68. The interview ended with Detective Nichols asking Savanh if he had any more questions. The only questions Savanh had were about making arrangements to have his front door fixed. There was an extensive exchange about the fact that the officers had broken the door. Detective Nichols gave Savanh

the number for risk management.  Savanh repeatedly asked whether the police would fix the door

or make arrangements to have the door fixed.  During the exchange, Detective Nichols said that

he did not know whether risk management would do it, because this was not a situation in which

the police had kicked in the wrong door.  Savanh responded, "I'm not saying that."  Savanh

persisted in asking whether risk management would give him a number for somebody to repair

the door really quick.  Nichols responded that risk management would probably tell him to look

for someone in the white pages to find a carpenter to get it fixed.  Savanh responded, "I thought

you had something like, you know, like tomorrow.  You guys do this every day, don't you?"  *Id.*

at 70.  Nichols responded that police serve search warrants every day, but didn't fix doors.  *Id.*

The discussion continued for another two pages of transcription.  In short, the transcript and

audio recording simply do not support Savanh's arguments that he was subjected to a coercive

police environment that overbore his will.

Having reviewed and considered the moving and responsive papers and supporting

exhibits,

**IT IS RECOMMENDED** that the Motion to Suppress Statements be **DENIED** as

untimely.  However, as the government has the burden of proving by a preponderance of the

evidence whether a confession was voluntary before it is introduced,  **IT IS RECOMMENDED**

that the government be required to lay a foundation at trial before the incriminating statements

are admitted.

DATED this 1st day of April, 2016.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE